James M. PROCTOR

v.

**PRINCE GEORGE'S HOSPITAL CENTER.**

No. Civ.A. DKC 96–1870.

United States District Court, D. Maryland.

Aug. 24, 1998.

Marc P. Charmatz, National Association of the Deaf, Silver Spring, MD, Laura Lee Rovner, Law Office, Syracuse, NY, Douglas L. Parker, Law Office, P.H., Washington, DC, Lisel Loy, Law Office, Washington, DC, Sunil H. Mansukhani, Institute for Public Representation, PH, Washington, DC, for James M. Proctor, plaintiff.

Eric Hemmendinger, Shawe & Rosenthal, Baltimore, MD, Gary L. Simpler, Shawe & Rosenthal, Baltimore, MD, for Prince George's Hospital Center, defendant.

### MEMORANDUM OPINION

CHASANOW, District Judge.

This disability discrimination action is before the court on Plaintiff James M. Proctor's motion for summary judgment as to liability and a cross motion by Defendant Prince George's Hospital Center ("PGHC") for summary judgment as to damages. Plaintiff, who is deaf, alleges that Defendant violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and either Title II or III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., when it failed to provide him with sign language interpreters at several points during his hospital stay after a motorcycle accident. Plaintiff alleges that these failures excluded him from meaningful participation in his medical treatment, and that this exclusion amounts to discrimination directly linked to his disability. The issues are fully briefed, no hearing is deemed necessary, and the court now rules pursuant to Local Rule 105.6.

### I. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. Anderson, 477 U.S. at 250, 106 S.Ct. 2505; see also Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir.1987); Morrison v. Nissan Motor Co., 601 F.2d 139, 141 (4th Cir.1979); Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. FED.R.CIV.P. 56(c); Pulliam Inv. Co., 810 F.2d at 1282 (citing Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Gill v. Rollins Protective Servs. Co., 773 F.2d 592, 595 (4th Cir.

1985). Further, the court must refer to the substantive allocation of the burdens of production and persuasion to determine the nature of the presentation required by each party. *See United States v. Leak,* 123 F.3d 787, 793 (4th Cir.1997):

> [T]he question of whether that material fact creates a genuine issue must be evaluated in light of the substantive standard of proof that would apply at a trial on the merits. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that a summary judgment motion must be considered in light of the evidentiary burden the substantive law places on the non-moving party).

As the Sixth Circuit has stated:

> Rule 56(c) requires the moving party to show not only the absence of a disputed issue of fact but also that he is entitled to judgment as a matter of law. In assessing the sufficiency of the evidence to sustain a particular inference, therefore, the court must also consider the burden of proof on the issue and where it will rest at trial. When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial. *But where the moving party has the burden* —the plaintiff on a claim for relief or the defendant on an affirmative defense—*his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.*

*Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–488 (1984)) (emphasis in original).

A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson,* 477 U.S. at 256, 106 S.Ct.

2505. In *Celotex Corp.,* the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## II. *Background*

In July of 1991 and January of 1992, deaf former PGHC patients filed complaints with the Office for Civil Rights of the United States Department of Health and Human Services ("OCR"), alleging that the hospital failed to provide them with effective communication during their treatment. In December of 1993, the OCR found that PGHC was in violation of § 504. (Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, Paper no. 18, Ex. A). Shortly before the OCR released its finding, and apparently as a result of the OCR's investigation, PGHC revised its policy on accommodations for hearing impaired patients. (Opposition to Plaintiff's Motion for Summary Judgment and Cross Motion for Summary Judgment on Damages, Paper no. 23, Ex. 1).

Mr. Proctor is a deaf individual who, on the evening of April 23, 1995, was involved in a motorcycle accident. His left leg and foot were mangled, and he was flown by helicopter to PGHC, where he arrived around 9:00 p.m. His family arrived shortly thereafter.

Upon arrival, Mr. Proctor was lucid, but in shock. The medical record shows that he was medicated with pain-killers and dozed off while in the Emergency Room. Mr. Proctor claims that during this period he motioned to several doctors that he needed a sign interpreter. The Emergency Service Record notes that "the patient is hearing impaired, but reads lips well." (Paper no. 23, Ex. 7). Later that evening, Mr. Proctor's physicians concluded that his foot was not viable and that amputation was necessary. Hospital records indicate that Dr. Bijan Ghovanlou and Dr. Bakulesh Patel spoke to Mr. Proctor and informed him that surgery was called for, but that Plaintiff initially refused to provide consent. (Paper no. 23, at Ex. 8).

At 1:30 a.m. on April 24, doctors treating Plaintiff met with his family and informed them that the foot was unsalvageable and required amputation. They also asked that the family members talk to Plaintiff about the need for the procedure. Evelyn DeMesme, Plaintiff's sister, testified at deposition that, before leaving the hospital, she and her husband reminded an emergency room attendant that Plaintiff was deaf and needed an interpreter. According to the testimony, the attendant told them that an interpreter would be provided. (Paper no. 18, Ex. H at 16).

The next day, Plaintiff was presented with the consent form for the amputation surgery. After some delay, a medical technician from another department was called in to translate.[1] There is some dispute as to exactly what was communicated and as to the technician's level of ability to interpret, but it is undisputed that a nurse read the informed consent form aloud to Plaintiff while the medical technician translated it.[2] Plaintiff signed the consent form. Dr. Ghovanlou also testified that he conversed with Mr. Proctor while he was prepping him for surgery, and that he was satisfied Mr. Proctor understood his explanation of the surgery. (Paper no. 23, Ex. 9, 28–29).

On April 25, Mr. Proctor was in the Intensive Care Unit, under heavy sedation. While visiting, Mrs. DeMesme requested a licensed sign interpreter, however, none was provided. Dr. Ghovanlou visited Mr. Proctor on this day and testified that he interacted with Plaintiff to the same extent he ordinarily would interact with a patient. On April 26, Mrs. DeMesme asked about the status of providing a sign interpreter. When Mrs. DeMesme later learned that Plaintiff required a second surgery called a "stump revision," requiring a second consent form, she was told that a licensed sign interpreter would be provided that evening. Later, she was informed that no interpreter would be available until the following morning. That morning, Mrs. DeMesme was told that there would be an additional delay. A nurse informed Mrs. DeMesme that she should contact Doug Carl from the PGHC administrative office. Mrs. DeMesme met with Mr. Carl and expressed frustration about the hospital's failure to provide her brother with an interpreter. Mr. Carl investigated her complaint, and assured her that an interpreter would be available at 11:30 a.m. An interpreter arrived at roughly 11:30 and translated the consent form.[3] Also present at this translation was a physician's assistant in orthopedics. Soon after, Plaintiff signed the consent form and the surgery was performed.

Following the surgery on April 27, Mr. Proctor was transferred to a convalescent care unit and was still semi-conscious. Nurs-

---

1. Defendant asserts that it attempted to secure an outside interpreter on April 24. Unfortunately, for the first time in PGHC's experience, it was unable to provide the requested service in a timely fashion. (Paper no. 18, Ex. I, supplemental answers to interrogatory no. 12).

2. The informed consent form of April 24, stated, "Irrigation and debridement, exploration of severe compound comminuted segmental fxs of left tibia and fibula and shredding degloving circumferential injury lower leg, possible below knee amputation left leg. irrigation left femur." (Paper No. 18, Ex. J).

3. The second consent form read, "Revision of left leg stump and closed interlocking intramedullary rodding of fractured left femur." (Paper No. 18, Ex. L).

ing progress notes show that he was able to verbalize his requests. During this period through May 1, Dr. Ghovanlou explained the second surgery to Plaintiff through written notes and lipreading and was satisfied that such communications were effective.

On May 1, Plaintiff was asked to sign an informed consent form for a third surgery which was explained by Dr. Ghovanlou through lip reading and written notes. Plaintiff signed this consent form on May 1. On May 2, Dr. Ghovanlou inserted a rod into Plaintiff's leg, and on May 3, Plaintiff began physical therapy sessions. Also on May 3, Plaintiff requested via a written note that an interpreter be provided each time he was to speak with a doctor "so that I can be sure to ask question. So I will know everything the doctor is saying ." (Paper no. 18, Ex. U). No interpreters were present during Mr. Proctor's first two physical therapy sessions. Interpreters were present for all of Plaintiff's subsequent physical therapy sessions. Additionally an interpreter was present at a May 8 meeting between Plaintiff, his family, his doctors and a social worker. Plaintiff was discharged from PGHC on May 10.

### III. *Analysis*

#### A. ADA Claims—Status of PGHC

Plaintiff's Amended Complaint asserts alternative claims under both Titles II and III of the ADA. Title II prohibits public entities from discriminating against persons with disabilities, and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services ... of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. Title III applies to privately operated public accommodations, including hospitals, and prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(a); 42 U.S.C. § 12181(7)(F) (hospitals as public accommodations).

Plaintiff's original complaint alleged that PGHC was liable under Title II and PGHC originally admitted that it was covered by Title II. In its opposition brief on summary judgment, it asserted that this admission was inadvertent and that it, instead, was a Title III entity. (Opposition to Plaintiff's Motion for Summary Judgment and Cross Motion for Summary Judgment on Damages, Paper no. 23, at 17). Plaintiff then filed the Amended Complaint, pleading in the alternative. In turn, PGHC filed an answer in which it denied that it was a public entity under Title II. (Defendant's Answer to Plaintiff's Amended Complaint, Paper no. 33 at ¶ 10). Thus, PGHC now has denied that it is covered by Title II. For purposes of the present motions, but after an opportunity for discovery on the issue, Plaintiff stated that is treating PGHC as a Title III entity. (Reply Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion for Partial Summary Judgment, Paper no. 27, at p. 2 n. 1). It is unclear whether Plaintiff intends to litigate the issue of PGHC's status under the ADA. If so, the time has come. Thus, unless cause to the contrary is shown, the court will dismiss all claims under Title II, and will proceed only under Title III. As will be explained below, the issue of PGHC's status must be resolved because of the different relief available to private parties under the provisions.

#### B. Injunctive Relief

Plaintiff seeks injunctive relief as well as damages. No cause of action for damages is available to private parties, however, under Title III, although damages are available under Title II. A plaintiff may, however, obtain injunctive relief in appropriate cases under Title III. While neither motion raises an issue regarding the availability of injunctive relief, the Amended Complaint does not demonstrate the requisite predicate for seeking such relief. It is appropriate for a district court to raise issues of justiciability *sua sponte. Hill v. United States Immigration and Naturalization Service*, 714 F.2d 1470, 1481 n. 13 (9th Cir.1983) (holding same in the context of an injunction); *see also Texas v. Florida*, 306 U.S. 398, 405, 59 S.Ct. 563, 83 L.Ed. 817 (1939) (raising issues of jurisdiction *sua sponte*). See also, Collins Holding Corp. v. Jasper Co., S.C., 123 F.3d 797, 799 n. 1 (4th Cir.1997) (noting that

courts must address *sua sponte* jurisdictional doubts even if not raised by the parties.)

In *Aikins v. St. Helena Hosp.*, 843 F.Supp. 1329 (N.D.Cal.1994), the United States District Court for the Northern District of California dealt with similar issues. There, the widow of a hospital patient asserted that the hospital's failure to provide her with a sign language interpreter prevented her from effectively communicating with hospital personnel and from effectively participating in her husband's care. The court dismissed Plaintiff's ADA claims, holding that she was not entitled to injunctive relief and noting that:

> [A] plaintiff seeking injunctive relief premised upon an alleged past wrong must demonstrate a 'real and immediate threat' of repeated future harm to satisfy the injury in fact prong of the standing test. This requirement is independent of the substantive requirements for equitable relief.

*Id.* at 1333 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)); *see also Naiman v. New York University*, 1997 WL 249970 (S.D.N.Y. May 13, 1997) (dismissing injunctive claim for failure to demonstrate that plaintiff would require hospital's services on a future occasion).

In *Lyons*, the Court held that a plaintiff who had been subjected to a "chokehold" by the Los Angeles police "would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such a manner." *Lyons*, 461 U.S. at 105–106, 103 S.Ct. 1660. Mrs. Aikins' claims were dismissed because she had not shown "that she is likely to use the hospital in the near future, nor that defendants are likely to discriminate against her when she does use the hospital." *Aikins*, 843 F.Supp. at 1334. The court also held that it could not "infer" that the defendants "routinely fail to comply with applicable anti-discrimination statutes." *Id.* Finally, the court held that "Mrs. Aikins has not shown that defendants' alleged discrimination is on-going and that she is likely to be served by defendants in the near future." *Id.* Therefore, the court dismissed her claims for injunctive relief with leave to amend to show that she faces a "real and immediate threat of future injury at the hands of defendants." *Id.*; *see also Bryant v. Cheney*, 924 F.2d 525, 528–529 (4th Cir.1991) (discussing *Lyons* and cautioning courts not to "emit random advice" by using their "broad and vital" injunctive and declaratory powers to "enjoin the conjectural or declare the fully repaired broken."); *compare Suhre v. Haywood County*, 131 F.3d 1083, 1090–91 (4th Cir.1997) (holding that plaintiff who had often appeared in courtroom where Ten Commandments were displayed, and who likely would make future appearances, had standing to seek injunctive relief).

By now, several months have passed since Plaintiff was discharged from PGHC. Thus, even if Plaintiff correctly alleges that he was the victim of discrimination, the present record does not reflect any on-going discrimination against him or that he is likely to return to PGHC in the near future. While the OCR's findings do not have binding effect in this court, the complaints and order evidence that issues have arisen regarding whether PGHC is in compliance with the ADA. However, the relevance of the past complaints is limited by the fact that the hospital subsequently amended its policy designed to prevent violations. Plaintiff has not challenged the policy's adequacy. Instead, Mr. Proctor contends that PGHC failed to follow it when treating him. Additionally, Plaintiff must demonstrate that any violation resulted from conditions that make repeated violations likely if Mr. Proctor should return to PGHC.

On the present record, it is unlikely that an injunction would be appropriate, even if Plaintiff prevails on the merits. Nothing in the complaint demonstrates the necessary threshold for such relief has been met. Accordingly, Plaintiff will be given an opportunity to SHOW CAUSE why his claim under Title III and his claim for injunctive relief under the Rehabilitation Act should not be dismissed in accordance with this opinion.

B. Rehabilitation Act Claims

1. Statutory and Regulatory Framework

Plaintiff also seeks summary judgment as to liability on his Rehabilitation Act claim. Section 504 provides:

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity conducted by any executive agency.

29 U.S.C. § 794. To establish a violation of § 504, Mr. Proctor must prove that: (1) he has a disability; (2) he is otherwise qualified; (3) he was excluded from participation in, was denied the benefits of, or was subjected to discrimination solely by reason of his disability; and (4) PGHC receives federal financial assistance. *Doe v. University of Maryland,* 50 F.3d 1261, 1265 (4th Cir.1995). The parties agree that the only element in dispute is whether PGHC failed adequately to accommodate him by providing interpreters at various stages of his treatment.

Regulations promulgated under the Act, govern the interaction between a hospital and hearing impaired patients and, though not binding on courts, are instructive. *Rothschild v. Grottenthaler,* 907 F.2d 286, 291 (2d Cir.1990), citing *Alexander v. Choate,* 469 U.S. 287, 304 n. 24, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). The Regulations state:

§ 84.52 **Health, welfare, and other social services.**

(a) *General.* In providing health, welfare, or other social services or benefits, a recipient may not, on the basis of handicap: ****

(2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered nonhandicapped persons;

(3) Provide a qualified handicapped person with benefits or services that are not as effective (as defined in § 84.4(b)) as the benefits or services provided to others;

(4) Provide benefits or services in a manner that limits or has the effect of limiting the participation of qualified handicapped persons.

45 C.F.R. § 84.52(a)(2)–(4). As a recipient of federal funds that employs fifteen or more people, PGHC must also "provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R. § 84.52(d)(1). The above provisions reference 45 C.F.R. § 84.4(b), which makes clear that what is required is an equal opportunity to benefit or participate in provided services. 45 C.F.R. § 84.4(b)(1)(ii)–(iii). The regulations do not, however, require that Defendant provide services which "produce the identical result or level of achievement for handicapped and nonhandicapped persons" so long as they "afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit ... in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2).

Regulations under the ADA also are instructive due to similarities between the Acts. These regulations similarly require that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c). Examples of auxiliary aids include:

Qualified interpreters, notetakers, computer-aided transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

28 C.F.R. § 36.303(b)(1). Additionally, the Department of Justice's Technical Assistance Manual ("the Manual") strongly suggests that sign language interpreters are necessary in settings where complex information must be conveyed and provides the following example:

ILLUSTRATION 2a: H goes to his doctor for a bi-weekly checkup, during which the nurse records H's blood pressure and weight. Exchanging notes and using ges-

tures are likely to provide an effective means of communication ... BUT: Upon experiencing symptoms of a mild stroke, H returns to his doctor for a thorough examination and battery of tests and requests that an interpreter be provided. H's doctor should arrange for the services of a qualified interpreter, as an interpreter is likely to be necessary for effective communication, given the length and complexity of the communication involved.

(Paper no. 18, Ex. V § III–4.3200). The Manual also states that while the public accommodation should consult with the disabled individual as to what type of aid is required, the public accommodation ultimately is responsible for selecting the appropriate auxiliary aid "provided that the method chosen results in effective communication." (*Id.*). Finally, the Manual notes that the interpreter must be able to engage in two-way communication between the patient and hospital staff. (*Id.*).

Courts have found violations of the Rehabilitation Act and the ADA in cases where public accommodations, or public entities, failed to provide sign language interpreters. *See e.g., Rothschild v. Grottenthaler,* 907 F.2d 286 (2d Cir.1990) (finding that school system must provide an enrolled hearing student's deaf parents with a sign language interpreter at "school initiated conferences incident to the academic and/or disciplinary aspects of their child's education"); *Randolph v. Rodgers,* 980 F.Supp. 1051 (E.D.Mo. 1997) (holding that prisoner whose primary means of communication was sign language was entitled to interpreter for disciplinary procedures, medical care, educational programs, and counseling). Neither the precedents nor the regulations, however, establish a *per se* rule that sign language interpreters are necessary in hospital settings. In fact, the Supreme Court has held that sign language interpreters are not required when lip reading, or by extension other accommodations, are sufficient. *Board of Education v.*

*Rowley,* 458 U.S. 176, 208, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).[4]

### 2. Defendant's Arguments Regarding Liability

Defendant resists summary judgment on liability by arguing that Plaintiff's care met the above standards when the course of treatment is viewed as a whole and, in the alterative, that Plaintiff has not demonstrated the absence of material factual dispute as to whether he failed to receive equal benefit or whether his ability to participate in his care was improperly limited.

### a. Evaluation of Care as a Whole

■ PGHC notes that a sign language interpreter was provided on a number of occasions and that Plaintiff "left the hospital with a clear sense of what his future course of recovery would be." (Paper no. 23 at 23). The hospital, however, fails to provide any case law or statutory support for the position that accommodations that only allow after-the-fact understanding are sufficient when a hearing patient would have had greater opportunity to benefit and participate at various stages of his care. The real inquiry is whether equal opportunity was provided *during* the course of Plaintiff's treatment. The treatment in this case involved several distinct procedures for which consent and follow-up were required and a period of physical therapy. Mr. Proctor had a right under the Rehabilitation Act to benefit equally from each of these services and to participate equally at all points in time. Prior case law also does not evaluate the provision of accommodations as a whole. Rather courts have focused on specific instances during the interaction between the disabled individual and the public accommodation or public entity. *See Rothschild,* 907 F.2d at 293 (examining deaf parent's requests for interpreters at school activities individually); *Randolph v. Rodgers,* 980 F.Supp. at 1061–62 (examining

---

**4.** PGHC argues that cases such as *Rothschild, Jones v. Illinois Dept. of Rehabilitation Services,* 689 F.2d 724 (7th Cir.1982), and *Clarkson v. Coughlin,* 898 F.Supp. 1019 (S.D.N.Y.1995), are inapposite because communication is the central activity in educational environments while care is central to hospital settings. This argument

fails. As both common experience and the regulations indicate, communication between a patient and physicians and staff of a hospital is an integral part of the medical care. For example, communication is central to obtaining informed consent.

separately an inmate's medical care, educational training, and disciplinary proceedings to determine whether a prison had violated the law on specific occasions, rather than viewing his entire incarceration as a whole); *Naiman v. New York Univ.*, 1997 WL 249970 (S.D.N.Y. May 13, 1997) (citing several visits without interpreters as separate incidents); *Clarkson v. Coughlin*, 898 F.Supp. 1019, 1044 (S.D.N.Y.1995) (evaluating separate instances during the incarceration of deaf inmates where they were not provided with auxiliary aids); *Aikins*, 843 F.Supp. 1329, 1332 (N.D.Cal.1994) (noting separate times when the deaf wife of a patient was not provided with an interpreter to explain her husband's treatment). Plaintiff's hindsight understanding of his care would not justify a finding that Mr. Proctor's rights were not violated by inadequate accommodations at various stages of his treatment.

#### b. Entitlement to Summary Judgment as a Matter of Law

■ Defendant also argues, however, that summary judgment is inappropriate as the record does not clearly demonstrate that Plaintiff was denied an equal benefit or equal participation. Defendant notes that Plaintiff has introduced no evidence regarding the treatment of non-hearing impaired patients, in particular those who have suffered traumatic injuries such as those suffered by Mr. Proctor. The court agrees that without knowing what communication would ordinarily have occurred at various points during the treatment of such a patient, it is impossible to evaluate whether Plaintiff enjoyed equivalent opportunities. The record also contains evidence which conflicts with Plaintiff's position regarding the effectiveness of alternative communication methods. Dr. Ghovanlou, Plaintiff's primary physician, testified that Plaintiff indicated to him that he understood what was occurring and that his communications with Plaintiff were as substantive as his usual communications with hearing patients.

Dr. Patel's deposition testimony suggests that Plaintiff's lack of awareness that his leg had been amputated may have resulted from denial and phantom sensations rather than from inadequate communication. Plaintiff's deposition and that of his sister demonstrate that Plaintiff was incoherent during much of the early portion of his treatment and that he has incomplete recall as to this time period. Thus, factors which limited his ability to communicate, and which may affect his ability to recall communications that occurred, require further exploration in assessing whether lip reading and note passing were adequate accommodations. Therefore, it remains for the finder of fact to determine whether PGHC provided adequate auxiliary aids.[5]

#### 3. Availability of Damages

#### a. Requisite Level of Intent

■ The parties do not dispute that compensatory damages are only available in cases of intentional discrimination. PGHC asserts, however, that the evidence in this case reveals only that any violation occurred as a result of "thoughtlessness and indifference" rather than because of any intent to deny Plaintiff's rights. In response, Plaintiff argues that the requirement of intentional action is satisfied by proof that PGHC acted "knowingly, voluntarily, and deliberately." (Paper no. 27, at 10).

In *Bartlett v. New York State Board of Law Examiners*, 970 F.Supp. 1094 (S.D.N.Y. 1997), the court discussed the unique nature of intent as it is relevant to compensatory damages in accommodation cases under the Rehabilitation Act:

> [T]he concept of intent in an accommodations case such as this one is markedly different from the concept of intent in employment discrimination cases or in cases involving a palpable bias or animus against disabled persons. In those cases, there is a negative action taken toward an employ-

---

**5.** Additionally, Defendant's assertion that "[i]n medical care, many events are not predictable," is only relevant to whether an interpreter should have been available when Plaintiff first arrived at PGHC. Dr. Patel's statement that it would not have been practical to have an interpreter available for day-to-day communications because he does not keep to a regular schedule when making

rounds is not dispositive. (Paper no. 23, Ex. 17 at 41–42). If an interpreter is required, the accommodation of coordinating timing with the interpreter might present only a minimal burden. A more detailed explanation of the problem such scheduling would create is necessary to presentation of an undue hardship defense.

ee because of his or her disability (most often a termination or an alteration in the terms or conditions of employment) or an adverse action taken against a group of disabled individuals because of their disability. In the instant case, however, as in all accommodations cases, the concept of intent is more difficult to pinpoint because it is the defendants' failure to provide the plaintiff with an advantage which is the very subject of the "discrimination."

*Id.* at 1149. The court went on to hold that: [T]he question of intent in accommodations cases does not require that plaintiff show that defendants harbored an animus towards her or those disabled such as she. Rather, intentional discrimination is shown by an intentional, or willful, violation of the Act itself. With this understood, it becomes clear, that while defendants may have had the best of intentions, and while they may have believed themselves to be within the confines of the law, they nevertheless intentionally violated the ADA and the Rehabilitation Act by willfully withholding from plaintiff the reasonable accommodations to which she was entitled under the law. They had notice of the potential risk of their decision, and clearly refused the accommodation knowingly.

*Id.* at 1151.[6] It cannot be said that PGHC, which had been subject to a past complaint to the OCR, did not have notice of potential liability that arises when determining the accommodations appropriate for hearing-impaired patients. Defendant also does not deny that it deliberately chose to rely on methods of communication other than a sign language interpreter on numerous occasions. As *Bartlett* explains, it is not enough merely to believe that one's actions do not constitute a violation of the law if such a belief represents a "miscalculation." *Id.* at 1149.

■ Additionally, as noted in *Bartlett,* this analysis squares with the Supreme Court's finding in *Alexander v. Choate* that "much of the conduct Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by discriminatory intent." 469 U.S. 287, 296–97, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). The Court explained, "For example, elimination of architectural barriers was one of the central aims of the Act, yet such barriers were clearly not erected with the aim or intent of excluding the handicapped...." *Id.* at 297, 105 S.Ct. 712. "At the very least, [*Alexander* ] demonstrates an awareness on the part of the Supreme Court that the concept of intent differs markedly in accommodations cases, and hence that a different conception of intent is appropriate for recovery of compensatory damages in non-employment accommodations cases." *Bartlett,* 970 F.Supp. at 1150. Thus, in cases where a public accommodation is on notice that its failure to provide an accommodation may violate the Rehabilitation Act and intentionally opts to provide a lesser accommodation, compensatory damages are available. Mr. Proctor need not show that PGHC harbored discriminatory animus. Therefore, this aspect of Defendant's motion will be DENIED.

### b. Punitive Damages under § 504

■ PGHC argues that punitive damages are not available under the Rehabilitation Act. This position, however, directly contradicts *Pandazides v. Virginia Bd. of Educ.,* 13 F.3d 823, 830–831 (4th Cir.1994), where the Fourth Circuit held that a "a full panoply of legal remedies are available" under § 504 and alluded to the standard for punitive damages. *Id.* at 830 n. 9. The Fourth Circuit relied on the Supreme Court's holding in *Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), that "absent a clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Id.* at 71, 112 S.Ct. 1028. The Fourth Circuit held that *Franklin,* a Title IX case, applied in the context of the Rehabilitation Act because of

---

6. *See also, Love v. McBride,* 896 F.Supp. 808 (N.D.Ind.1995) (holding jury instructions of intent in an ADA case to be knowingly, willfully, voluntarily, and deliberately); *Ferguson v. City of Phoenix,* 931 F.Supp. 688, 697 (D.Ariz.1996)

(stating that the level of proof necessary for finding intentional discrimination under Rehabilitation Act means a deliberate indifference to a strong likelihood that a violation of federal rights would result).

similarities in the wording and history of the relevant provisions.

As this court is bound by Fourth Circuit precedent, PGHC's citation to the Sixth Circuit's *en banc* opinion in *Moreno v. Consolidated Rail Corp.*, 99 F.3d 782 (6th Cir.1996), is unpersuasive. Additionally, Plaintiff correctly notes that the Third, Eighth, and Eleventh Circuits also have held that *Franklin* dictates that the full panoply of remedies are available under § 504. See *W.B. v. Matula*, 67 F.3d 484, 494 (3d Cir.1995); *Rodgers v. Magnet Cove Public Schools*, 34 F.3d 642, 644 (8th Cir.1994); *Waldrop v. Southern Co. Services*, 24 F.3d 152, 157 (11th Cir.1994). Further, the majority of decisions hold that the "full panoply" includes punitive damages. *See Burns–Vidlak by Burns v. Chandler*, 980 F.Supp. 1144, 1147 (D.Haw.1997) (citing cases). Thus, punitive damages are available under § 504.

### c. Punitive Damages Based on the Merits

 Defendant's alternative argument—that Plaintiff has not produced evidence of conduct which would give rise to liability for punitive damages—is no more availing. Punitive damages would be appropriate if the fact finder determines that PGHC acted with "malice" or "reckless indifference" to Plaintiff's rights under the Rehabilitation Act. *Kilroy v. Husson College*, 959 F.Supp. 22, 24 (D.Me.1997). From the moment he entered the hospital, Plaintiff requested an interpreter. Mr. Proctor and his family made several subsequent demands for an interpreter. Despite this, the hospital only occasionally provided an interpreter and did not necessarily make adequate use of the interpreter. Further, the hospital's own policy and relationship with an interpreter service indicate awareness that an interpreter may be necessary in such situations. As held above, it is not clear as a matter of law that Plaintiff was entitled to an interpreter. If the hospital is ultimately found to have violated the Rehabilitation Act, however, the repeated failure to provide an interpreter could justify an award of punitive damages. Thus, the court denies Defendant's cross-motion for summary judgment as to damages.

### IV. *Conclusion*

For the foregoing reasons, both Plaintiff's motion for summary judgment as to liability and Defendant's motion for summary judgment as to damages are DENIED. Additionally, Plaintiff is ordered to SHOW CAUSE why Counts I and II of his Amended Complaint, and all claims for injunctive relief, should not be dismissed, both because he lacks standing to seek injunctive relief and because Defendant is not a Title II entity under the ADA. A separate order will be issued.