**Darrin MAJOCHA and Anna Majocha, Plaintiffs,**

v.

**Joseph TURNER, M.D.; Michael A. Gottleib, M.D.; Louis S. Felder, M .D.; and Pittsburgh Ear, Nose & Throat Associates, Defendants**

No. CIV.A. 00–552.

United States District Court, W.D. Pennsylvania.

Sept. 13, 2001.

Mark J. Murphy, Carol A. Horowitz, Disabilities Law, Disabilities Law Project, Pittsburgh, PA, Mary C. Vargas, Marc P. Charmatz, National Association for the

Deaf Law Center, Silver Spring, MD, for Darrin Majocha, Anna Majocha, plaintiffs.

Alan S. Baum, Gaca, Matis, Baum & Rizza, Pittsburgh, for Joseph Turner, M.D., Michael A. Gottlieb, M.D., Louis S. Felder, M.D., Pittsburgh Ear, Nose & Throat Associates, defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Fifteen month old Darrin ("D.J.") Majocha suffered from chronic ear infections in 1999. D.J.'s pediatrician referred his parents to Dr. Joseph Turner, M.D., a preeminent specialist at the Pittsburgh Ear, Nose and Throat Associates ("ENT"), to discuss the possibility of surgery to insert tubes in D.J.'s ears. On or about August 25, 1999, Anna Majocha called ENT to make an appointment for her and her husband, Darrin Majocha, to bring D.J. in for an evaluation with Dr. Turner. Darrin Majocha is deaf and has communicated primarily by use of American Sign Language ("ASL") all of his life, and his family has an extensive history of severe hearing impairment.

The parties agree that: (i) an appointment with Dr. Turner was scheduled for September 3, 1999; (ii) Mrs. Majocha informed the receptionist and the office manager, Ms. Joan Hornbake, about Mr. Majocha's hearing impairment; (iii) Mrs. Majocha requested Dr. Turner's office supply a qualified ASL interpreter during the consultation; (iv) Ms. Hornbake indicated that Dr. Turner preferred to communicate with Darrin Majocha by written communication during the office visit; (v) the matter was not resolved on August 25, 1999; (vi) Mrs. Majocha spoke with Ms. Hornbake again on August 27, 1999, at which time Ms. Hornbake informed Mrs. Majocha that Dr. Turner would communicate by written notes and Mrs. Majocha insist-

ed that an ASL interpreter be provided so her husband could fully participate in the consultation and decision about treatment of their son.

The parties disagree about some of the details of these conversations, *e.g.*, how much information Mrs. Majocha gave Ms. Hornbake about her husband's hearing impairment, whether she initially agreed to accept note taking as a substitute or simply agreed to consider it, whether Dr. Turner's staff made it clear that the consultation would be for as long as it took to complete using written communication with Mr. Majocha, whether the parties had agreed to schedule a longer appointment to accomplish communication by written notes. What is not in dispute, however, is that on August 27, 1999, Ms. Hornbake sent the following letter to Mrs. Majocha, after Dr. Turner had reviewed it:

Dear Mr. & Mrs. Majocha:

Per our telephone conversation of this afternoon, *I am canceling [D.J.'s] appointment* with Dr. Turner on Friday, September 3, 1999.

As indicated during the conversation, *we feel we cannot meet your needs in caring for your child. Perhaps another ENT physician would better meet your needs and therefore be able to care for [DJ].*

*We suggest you contact the ENT department of Children's Hospital or your pediatrician for another referral.*

Sincerely,

/s/ Joan K. Hornbake

Joan K. Hornbake

Office Manager

cc: GIL Pediatrics . . . .

Complaint, Exhibit A (hereafter, "the Letter").

After receiving the Letter cancelling the appointment and advising plaintiffs to go elsewhere for treatment of their son, they

contacted the Ear, Nose and Throat department at Children's Hospital, and D.J. was operated on for placement of tubes in both of his ears on September 7, 1999. The surgery went well. On March 23, 2000, plaintiffs filed a complaint in this Court against Dr. Turner, ENT, Dr. Michael A. Gottleib, M.D., and Dr. Louis S. Felder, M.D., setting forth claims under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title III of the Americans with Disabilities Act, ("ADA"), 42 U.S.C. §§ 12101 *et seq.,* seeking a declaratory judgment, injunctive relief, compensatory and punitive damages and attorneys fees. Drs. Gottleib and Felder are listed on the ENT letterhead as "associates" of ENT, as is Dr. Turner, and all three physicians are officers of ENT according to Dr. Turner's deposition testimony.

Defendants have filed a motion for summary judgment (Document No. 18) setting forth a variety of reasons why this Court should grant summary judgment in their favor. After careful consideration of the motion for summary judgment, the memoranda of law in support and in opposition, and the statements of material facts in support and opposition with supporting materials attached, this Court will deny the motion for summary judgment. This is *not* a close decision.

Summary judgment is appropriate " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Woodside v. School Dist. of Philadelphia Bd. of Educ.,* 248 F.3d 129, 130 (3d Cir. 2001), *quoting Foehl v. United States,* 238 F.3d 474, 477 (3d Cir.2001) (citations omitted). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Doe v. County of Centre, PA,* 242 F.3d 437, 446 (3d Cir.2001); *Woodside,* 248 F.3d at 130; *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 151 (3d Cir.1999).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1230 (3d Cir.1993). With these standards in mind, the Court will review defendants' arguments for summary judgment *seriatim.*

**I. Defendants Complied with Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 as a Matter of Law.**

■ There is no doubt plaintiffs have offered more than adequate evidence to support their ADA and Rehabilitation Act claims, notwithstanding defendants' inexplicable assertion that there is not a "shred of evidence" to support their claims. Defendants' argument is based upon an unsupportable factual assertion and an erroneous legal position.

Factually, defendants claim there "was absolutely no denial of treatment or offer of treatment," Defendants' Memorandum of Law, at 3, that defendants offered to

communicate with Mr. Majocha through note taking in an appointment lasting as long as it would take, that plaintiffs declined as a matter of convenience because they did not want to take the additional time and were "frustrated" at the thought, and that plaintiffs' precipitous declination of their "offer" deprived defendants of the "opportunity" to work with plaintiffs to reach a mutually satisfactory solution to their respective needs. The short answer to defendants' assertion—that the record "absolutely" supports only their spin on the conversations between Mrs. Majocha and Ms. Hornbake—is this: the Letter.

The Letter, mention of which is *conspicuously* absent from defendants' Statement of Material Facts, unambiguously informs plaintiffs that defendants "cannot meet your needs," and advises them to find another doctor. There is nothing in the Letter to suggest defendants were open to negotiation toward a mutually acceptable solution, explaining why defendants believed they could accommodate Mr. Majocha's impairment via note taking only, or offering to discuss the matter further. Quite to the contrary, a reader of the Letter would reasonably (if not inevitably) believe that defendants were declaring the *end* of discussion, *not the beginning.* While defendants offer some deposition testimony that attempts to put the Letter in a more favorable context and tone it down to make it look like something less than an "absolute" refusal to treat or to consult over alternative accommodations, plaintiffs offer equally compelling countervailing evidence to bolster the inference that the Letter means just what it says. In any event, the Letter *alone* is sufficient to allow this case to proceed to the fact finder on this factual issue; it is as close to a smoking gun as it gets in federal court. The conflicting inferences about the conversations preceding the Letter present a classic issue of material fact and credibility for the fact finder to decide, to the extent they are material.

Legally, defendants make the equally unsupportable argument that their "offer" to consult with the Majochas via Dr. Turner's "note taking" and written communication in a lengthy appointment was sufficient, as a matter of law, to fulfill their obligations under the ADA and the Rehabilitation Act. Assuming arguendo that defendants actually made and conveyed such an offer to plaintiffs, that would not be the end of the story.

The Department of Justice regulations implementing the ADA provide in pertinent part:

(a) General. A public accommodation shall *take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services,* segregated or otherwise treated differently than other individuals *because of the absence of auxiliary aids and services,* unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense.

(b) *Examples.* The term "auxiliary aids and services" *includes*—(1) Qualified interpreters, notetakers, computer-aided transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, *or other effective methods* of making aurally deliv-

ered materials available to individuals with hearing impairments;

\*     \*     \*     \*     \*     \*

(c) *Effective communication.* A public accommodation shall furnish appropriate auxiliary aids and services where necessary *to ensure effective communication with individuals with disabilities.*

28 C.F.R. § 36.303 (emphasis added.)

Defendants' argument is that Dr. Turner offered to communicate by "note taking" and that, because they offered *one* of the auxiliary aids listed as an "example" of acceptable aids, they *necessarily* have fulfilled their obligation under the ADA. (As plaintiffs point out, Dr. Turner is undisputedly a preeminent ENT children's specialist, which is why they were referred to him and continue to seek his services, but there is little evidence in the record about his skills as a "note taker," especially when he is simultaneously communicating the medical information himself.) Moreover, defendants cite an example from the Attorney General's commentary on the regulation indicating that a bookstore would not be required to supply a sign interpreter to a customer making a book purchase because "effective communication can be conducted by note pad." Defendants' Memorandum of Law, at 4. Defendants' reference is to an excerpt from the Report of the Attorney General, *Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities,* July 26, 1991, 56 Fed.Reg. 35544. A similar argument is made under the Rehabilitation Act.

▮     Plaintiffs counter that the examples listed in section 36.303(b) of acceptable auxiliary aids are not exclusive and are not "one size fits all," *i.e,* a public accommodation cannot simply choose to offer one of the listed aids to any or all of its patients/customers and be content that it has ful-

filled its obligation under the regulations and the ADA and Rehabilitation Act. Interestingly, both sides rely on the Department of Justice's regulation section 36.303 in support of their respective positions, and it is clear that this regulation is entitled to substantial deference. *Yeskey v. Pennsylvania Dep't. of Corrections,* 118 F.3d 168, 171 (3d Cir.1997). The plain language of section 36.303 supports plaintiffs' interpretation. If there were any doubt, consideration of the Attorney General's *entire* commentary on section 36.303 would quite easily dispel it.

The Attorney General's Report on *Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities* sets forth the Department of Justice's commentary on the regulations implementing the ADA, and it is rather extensive. With regard to section 36.303, the report provides more fully:

Auxiliary aids and services include a wide range of services and devices for ensuring effective communication. *Use of the most advanced technology is not required so long as effective communication is ensured.* The Department's proposed § 36.303(b) provided a list of examples of auxiliary aids and services [which] is not an all-inclusive or exhaustive catalogue of possible or available auxiliary aids or services . . . .

\*     \*     \*     \*     \*     \*

The auxiliary aid requirement *is a flexible one. A public accommodation can choose among various alternatives as long as the result is effective communication. For example, . . . a bookstore would not be required to make available a sign language interpreter, because effective communication can be conducted by notepad.*

*A critical determination is what constitutes an effective auxiliary aid or service.* The Department's proposed

rule recommended that, in determining what auxiliary aid to use, *the public accommodation consult with an individual before providing him or her with a particular auxiliary aid or service.* This suggestion sparked a significant volume of public comment. Many persons with disabilities, particularly persons who are deaf or hard of hearing, recommended that the rule should require that public accommodations give "primary consideration" to the "expressed choice" of an individual with a disability....

Based upon a careful review of the ADA legislative history, the Department believes that Congress did not intend under title III to impose upon a public accommodation the requirement that it give primary consideration to the request of the individual with a disability [and] ... finds that strongly encouraging consultation with persons with disabilities, in lieu of mandating primary consideration of their expressed choice, is consistent with congressional intent.

The Department wishes to emphasize that public accommodations must take *steps necessary to ensure that an individual with a disability will not be excluded, denied services,* segregated or otherwise treated differently from other individuals *because of the use of inappropriate or ineffective auxiliary aids. In those situations requiring an interpreter, the public accommodations must secure the services of a qualified interpreter, unless an undue burden would result.*

In the analysis of § 36.303(c) in the proposed rule, *the Department gave as an example the situation where a note pad and written materials were insufficient to permit effective communication in a doctor's office when the matter to be decided was whether major surgery was necessary.* Many commenters objected to this statement, asserting that it gave the impression that only decisions about major surgery would merit the provision of a sign language interpreter. The statement would, as the commenters also claimed, convey the impression to other public accommodations that written communications would meet the regulatory requirements in all but the most extreme situations. *The Department, when using the example of major surgery, did not intend to limit the provision of interpreter services to the most extreme situations.*

*Other situations may also require the use of interpreters to ensure effective communication depending on the facts of the particular case. It is not difficult to imagine a wide range of communications involving areas such as health,* legal matters, and finances *that would be sufficiently lengthy or complex to require an interpreter for effective communication.*

Attorney General's Report, July 26, 1991, 56 Fed.Reg. at 35565–67 (emphasis added).

This Court quotes the Attorney General's Report at such length to place the Department's comments about the bookstore purchase in context and proper perspective. As the report in its entirety makes clear, a bookstore is not a health care provider, and the nature of the information accompanying the respective transactions are vastly different. The information ordinarily needed by a purchaser of a book is *far less* complicated than the information that must be communicated to the parents of a child with chronic ear infections who are considering invasive surgery to implant tubes in the child's ears, in order that the parents may make an informed and intelligent decision. Whether this procedure is considered "major sur-

gery" is not that important to this analysis; the point is that this surgical procedure, no matter how routine it may be to defendants, is not routine to the Majochas, and is obviously much closer to major surgery than to buying a book.

It is true, as defendants contend, that an impaired person cannot, under the commentary cited above, insist on a *particular* auxiliary aid, so long as the aid offered by the public accommodation ensures effective communication of information commensurate with that provided to non-impaired individuals. There is much more on the record than simply, as defendants characterize the matter, plaintiffs expressing their *preference* for a qualified ASL interpreter. On the contrary, plaintiffs have presented lay and expert evidence to support their contention that the *only* effective means of communication possible in this case is through a qualified ASL interpreter. Indeed, the expert report of Diana Saunders–Conley is sufficient to defeat summary judgment on the issue of the effectiveness of note taking in lieu of ASL interpretation under the circumstances of this case. Ms. Saunders–Conley, an Instructor at the Western Pennsylvania School for the Deaf, examined Mr. Majocha and took an extensive family history including the family's and his life long use of ASL as their primary language, tested Mr. Majocha for reading and writing skills and ASL proficiency, explained the ASL method of communication, and concluded:

Mr. Majocha is a native user of ASL, and he demonstrates an extremely high level of proficiency in the use and understanding of ASL. It is his first language and is his preferred language; the one that he best understands and with which he feels most comfortable expressing himself. *The use of ASL is strongly advised in order to ensure effective communication with Mr. Majocha. Given a situation in which an individ-*

*ual who is not proficient in ASL has a need to communicate with Mr. Majocha, the services of a qualified sign language interpreter would be necessary to ensure effective communication. This is especially true if the information to be discussed is important, complex, or in any way non-routine.*

Interpreters who are certified to perform the task of interpreting would be able to relay information between or among interested parties and provide mutual communication access. Such interpreters also are bound to adhere to Code of Ethics and are required to render the service confidentially and with impartiality. *The likelihood of misunderstanding and the frustrating, time-consuming and sometimes dire consequences that can result is dramatically reduced when skilled professional interpreters are used in a communication exchange.*

Plaintiffs' Statement of Material Facts, Saunders–Conley Expert Report, Exhibit B, at 5–6.

Ms. Saunders–Conley's expert opinion certainly seems reasonable and it finds support in the literature. *See, e.g.,* Tucker, B.P., *Access to Health Care for Individuals with Hearing Impairments,* 37 Hous.L.Rev. 1101, 1111–16 (2000); Chilton, E.E., *Ensuring Effective Communication: the Duty of Health Care Providers to Supply Sign Language Interpreters for Deaf Patients,* 47 Hast.L.J. 871 (1996). Because there is a genuine dispute as to whether defendants offered an acceptable auxiliary aid, whether they offered to negotiate or discuss further the effectiveness of any offered aid or Mr. Majocha's specific needs or attempted to learn more about his individualized needs, and whether "note taking" would be effective in any

event under the particular circumstances, among other material issues, the Court cannot rule, as a matter of law, that defendants met their obligation under the ADA and the Rehabilitation Act. Such issues will ordinarily make summary judgment inappropriate. *See, e.g., Soto v. City of Newark,* 72 F.Supp.2d 489 (D.N.J.1999); *Bravin v. Mt. Sinai Medical Center,* 186 F.R.D. 293 (S.D.N.Y.1999); *Proctor v. Prince George's Hospital Center,* 32 F.Supp.2d 820 (D.Md. 1998); *Aikins v. St. Helena Hospital,* 843 F.Supp. 1329 (N.D.Cal.1994) (*Aikins I*); *Mayberry v. Von Valtier,* 843 F.Supp. 1160 (E.D.Mich.1994). This case is no exception, and will proceed to the fact finder on the issues whether, under the ADA and the Rehabilitation Act of 1973, defendants refused to provide treatment to the child of a hearing impaired parent, and refused to offer auxiliary aids to communicate effectively with that parent.

## II. Plaintiff Anna Majocha Lacks Standing under Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

■ Mrs. Majocha is the parent and natural guardian of a child who, giving all reasonable inferences from the evidence on summary judgment to the non-moving parties, was denied treatment because defendants refused to consider providing reasonably effective auxiliary aids for communication with the deaf to the other parent/ guardian, Mr. Majocha. Defendants' argument that Mrs. Majocha lacks standing because she is not herself hearing impaired or "otherwise qualified" under section 504, is without merit. *See* section (b)(1)(E) of the ADA, 42 U.S.C. § 12182(b)(1)(E) ("AssociationIt shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."), and section (a)(2) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 42 U.S.C.A. § 2000d *et seq.* shall be available to *any person aggrieved* by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."). *See, e.g., Rothschild v. Grottenthaler,* 907 F.2d 286 (2d Cir.1990) (deaf parents of non-hearing impaired school children had standing and were otherwise qualified to seek remedies under Rehabilitation Act of 1973 for school district's refusal to provide sign interpreters for school meetings, conferences and events).

## III. Plaintiffs Lack Standing to Seek Injunctive Relief under Title III of the Americans with Disabilities Act.

■ This is defendants' best argument, but it too fails at this stage of the proceedings. Other than attorneys fees, injunctive relief is the only relief available to plaintiffs under Title III of the ADA. *Proctor,* 32 F.Supp.2d at 824. It is true that a line of cases, arguably beginning with *Aikins I,* 843 F.Supp. 1329, holds that injunctive relief is not available for a single instance of refusal to provide auxiliary aids to a patient who has not alleged or demonstrated a likelihood of seeking and being denied treatment without the necessary aids in the future. *See, e.g., Shotz v. Cates,* 256 F.3d 1077, 1081–82 (11th Cir.2001); *Deck v. American Hawaii Cruises, Inc.,* 121 F.Supp.2d 1292, 1297–99 (D.Haw.2000) (collecting cases); *Naiman v. New York Univ.,* 6 A.D.D. 1345, 10 NDLR Plaintiff 39 (S.D.N.Y.1997).

■ However, where a public accommodation in the health care field adheres to its policies of refusing to provide the requested auxiliary aid or has denied treatment altogether to an individual who seeks to receive treatment at the facility, injunctive relief may be available. Indeed, in the follow-up to *Aikins I*, the district court for the Northern District of California permitted the claim for injunctive relief to go forward after Mrs. Aikens amended her complaint, with leave of court, to allege that she stayed at her mobile home near the defendant hospital several times a year, considered it reasonably likely that she would seek to use its medical services in the future, and that the hospital engaged in a pattern and practice of denying equal access to the hearing impaired. *Aikins v. St. Helena Hospital*, 10 A.D.D. 544, 6 NDLR Plaintiff 129 (N.D.Ca.1994) (*Aikins II*). *See also Dudley v. Hannaford Bros. Co.*, 146 F.Supp.2d 82 (D.Me.2001) (where defendant declines to revise its policies which resulted in discrimination against plaintiff on the basis of his alleged disability, plaintiff is not required to perform a futile act of seeking the services again; injunctive relief is available); *Merchant v. Kring*, 50 F.Supp.2d 433 (W.D.Pa. 1999) (plaintiff had standing to seek injunctive relief where dentist refused treatment of patient and required patient to receive an HIV test); *Mayberry v. Von Valtier, supra* (plaintiff may seek injunctive relief under Title III of ADA where doctor refused to treat deaf patient because she did not want to provide a sign interpreter and had not revised her policies); Gardener, E.E., *Standing Difficulties Faced by Plaintiffs with Disabilities under Title III of the Americans with Disabilities Act*, 3 Loy. Poverty L.J. 113 (1997).

■ Here, plaintiffs aver that they still would like D.J. to be evaluated and treated by Dr. Turner for his chronic ear infections which, given the nature of such infections, are likely to recur and may require additional surgical procedures, and that they are prevented from doing so because defendants steadfastly refuse to alter their procedures for dealing with hearing impaired parents; Dr. Turner has always used written communication by notes in such cases (although plaintiffs offer evidence that Dr. Turner in fact uses qualified sign interpreters when the patients supply their own) and intends to continue that practice despite plaintiffs' exertion of rights claimed under the ADA and the Rehabilitation Act of 1973. At this point, the Court cannot say plaintiffs will be unable to prevail on their claim for injunctive relief and declaratory judgment, and they will have the opportunity to prove their case for such relief at trial.

## IV. Plaintiffs Are Not Entitled to Punitive Damages as A Matter of Law.

■ Plaintiffs are entitled to compensatory damages and may be entitled to punitive damages under the Rehabilitation Act of 1973 if they demonstrate that defendants engaged in discriminatory practices with malice or with reckless indifference to the rights of an aggrieved individual. *J.F. ex rel. D.F. v. School Dist. of Philadelphia*, 2000 WL 361866, at *19 (E.D.Pa.2000); *Merchant v. Kring*, 50 F.Supp.2d 433, 436 (W.D.Pa.1999); *Saylor v. Ridge*, 989 F.Supp. 680, 690 (E.D.Pa.1998); *Doe v. Shapiro*, 852 F.Supp. 1246, 1255 (E.D.Pa. 1994). As set forth above, plaintiffs have proffered sufficient evidence from which the jury might find that defendants acted at least with reckless indifference to their rights under the Rehabilitation Act of 1973, and the jury will be instructed to award such damages if that is its finding.

### V. Defendants, Gottleib And Felder, Are Entitled to Judgment as a Matter of Law

Defendants maintain that defendants Gottleib and Felder are not liable for any acts or conduct of Dr. Turner or ENS because they are merely "physician associates" who have no control over the operations of ENT. They offer no "facts" to support the claim that they are merely "physician associates," nor any authority to demonstrate why that status would shield them from liability. In fact, Ms. Hornbake testified that the three named physicians are owners and equal partners in the partnership known as Pittsburgh Ear, Nose and Throat Associates. Plaintiffs' Statement of Material Facts, Exhibit A–3, at 42–44.

In law, partners are equally liable for the conduct of other partners in Pennsylvania. 15 Pa.C.S. § 8325, "Wrongful act of partner." *See, e.g., In re Labrum & Doak*, 237 B.R. 275, 291 (E.D.Pa. 1999). More importantly for our purposes, the ADA provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by *any person who owns,* leases (or leases to), *or operates a place of public accommodation.*" 42 U.S.C. § 12182(a). Public accommodation includes the "professional office of a health care provider." 42 U.S.C. § 12181(7)(F). Therefore, "[i]n order to be subject to Title III of the ADA, a potential defendant must be '[a] person who owns, leases (or leases to), or operates a place of public accommodation.'" *Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F.Supp.2d 460, 480 (D.N.J.1998) (citing 42 U.S.C. § 12182(a)).

As owners, partners and officers of ENT, Drs. Gottleib's and Feldman's argu-ment that they are not exposed to any liability clearly is frivolous. *Cf. Douris v. County of Bucks*, 2001 WL 767579 (E.D.Pa.2001) (receptionist for Human Resources Department of the County is not one who owns, operates or leases a place of public accommodation).

For the foregoing reasons, defendants' motion for summary judgment will be denied.

### ORDER OF COURT

AND NOW, this 13th day of September, 2001, it is HEREBY ORDERED that Defendants' Motion for Summary Judgment (Document No. 18) is DENIED.